## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CLEAN HARBORS ENVIRONMENTAL<br>SERVICES, INC., a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>ESIS, INC., a Pennsylvania corporation;<br>MYERS MILLER & KRAUSKOPF, LLC, an<br>Illinois limited liability company; HOWARD<br>KRAUSKOPF, individually; and JASON M.<br>SAX, individually,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

## COMPLAINT

Plaintiff, Clean Harbors Environmental Services, Inc. ("Clean Harbors"), by its undersigned attorneys, and for its Complaint against ESIS, Inc. ("ESIS"), Myers Miller & Krauskopf, LLC ("Myers Miller"), Howard Krauskopf ("Krauskopf"), and Jason M. Sax ("Sax") (Myers Miller, Krauskopf, and Sax are collectively hereinafter referred to as "MMK"), states as follows:

### NATURE OF THE ACTION

1.      This action arises out of ESIS' negligent claims handling services and breach of its contractual and fiduciary duties to Clean Harbors under a claims handling services agreement ESIS entered into with Clean Harbors, including ESIS' negligent selection and supervision of MMK to represent Clean Harbors in an underlying bodily injury action, styled *Eddie Lopez and Sandy Lopez v. Clean Harbors Environmental Services, Inc. a/k/a Clean Harbors, Inc.,* and MMK's own negligence in connection with that representation (the "Lopez Action").

## THE PARTIES

2.     Plaintiff Clean Harbors is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Norwell, Massachusetts.   Clean Harbors, among other things, provides environmental and hazardous waste management services throughout the United States.

3.     Defendant ESIS is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania. ESIS is ACE USA's third-party claims administrator, licensed under the laws of Pennsylvania to provide claims adjusting services and risk management services to businesses located throughout North America. ESIS' ultimate parent is ACE Limited.

4.     Defendant Howard Krauskopf is a citizen of the State of Illinois and licensed to practice law in the State of Illinois.  Upon information and belief, Krauskopf is one of the Managing Members of Defendant Myers Miller.  Prior to joining Myers Miller, Krauskopf served as Assistant General Counsel for ACE USA Insurance Company (formerly Cigna Property and Casualty Company), whose ultimate parent company is also ACE Limited.

5.     Defendant Jason Sax is a citizen of the State of Illinois and licensed to practice law in the State of Illinois.  Upon information and belief, Sax is a member of Defendant MMK.

6.     Defendant Myers Miller is an Illinois limited liability company engaged in the practice of law, with its principal place of business in Chicago, Illinois.  Upon information and belief, Myers Miller's membership is comprised entirely of individuals who are citizens of the State of Illinois.  Myers Miller is a citizen of the State of Illinois by virtue of the Illinois citizenship of Defendants Jason Sax, and Howard Krauskopf, and the other members of Myers Miller.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) in that some Defendants reside in this judicial district, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and it is the judicial district in which all Defendants are subject to personal jurisdiction.

## ALLEGATIONS COMMON TO ALL CLAIMS

**A.     Clean Harbors Purchases Insurance from the ACE Group of Companies**

9.     Clean Harbors provides, among other things, environmental and hazardous waste management services throughout the United States.  As part of its business operations, Clean Harbors operates waste transfer, storage, and disposal facilities.  At all times material to the allegations in this Complaint, a related, but legally distinct company, Clean Harbors Services, Inc., leased and operated a waste disposal facility located at 11800 Stony Island, Avenue, Chicago Illinois (the "Chicago Facility").

10.     In 1997, Clean Harbors began purchasing insurance products from insurance companies under the umbrella of ACE USA, Inc., which is the U.S. based retail operating division of ACE Limited.  ACE USA, Inc. operates through several insurance companies using a network of offices throughout the United States, including Pacific Employers Insurance Co. ("PEIC") (collectively, the "ACE Group of Companies").  ACE USA, Inc.'s ultimate parent is ACE Limited.

11.     In November, 2000, Clean Harbors purchased a Comprehensive General Liability insurance policy from PEIC, Policy No. HDOG20577010, for the period from November 1, 2000 to November 1, 2001 (the "PEIC Policy"). The PEIC Policy provided defense and indemnity coverage to Clean Harbors for occurrences during the policy period for claims resulting from, among other things, bodily injury to a person, such as was alleged in the Lopez Action. PEIC, like ESIS, is a subsidiary of ACE USA, Inc. Also like ESIS, PEIC's ultimate parent is ACE Limited.

12.     Pursuant to Endorsement No. 2 of the PEIC Policy, PEIC delegated the duty to defend to ESIS in part, retained the duty to indemnify and maintained the right to assume control of the defense of claims falling within the PEIC Policy under certain delineated circumstances, all as set forth in Endorsement No. 2 to the PEIC Policy.

**B.     Clean Harbors Enters into a Claims Services Agreement with ESIS**

13.     As a condition of purchasing the PEIC Policy, and as it was required to do with previous insurance policies it purchased from the ACE Group of Companies, Clean Harbors was required, as a condition to PEIC issuing the PEIC Policy, to enter into a claims servicing agreement with ESIS, whereby ESIS would manage and adjust claims asserted against Clean Harbors under the PEIC Policy in exchange for the payment of certain fees by Clean Harbors.

14.     In November, 2000, Clean Harbors entered into a claims servicing agreement with ESIS, entitled the "ESIS Services Agreement" (the "ESIS Agreement"). (A true and accurate copy of the ESIS Agreement is attached as Exhibit A.) The ESIS Agreement imposed various obligations on ESIS with respect to claims asserted against Clean Harbors under the PEIC Policy, including without limitation, investigating and administering claims, arranging the

4

defense of the claims, and retaining experts, all in the "best professional judgment" of ESIS.

(*See* Exhibit A, at Section II, Part A, Paragraph 3.)

15.     Section II, Part A, Paragraph 3 of the ESIS Agreement provides, in relevant part:

**3.      CLAIMS ADJUSTING SERVICES - OBLIGATIONS OF ESIS** - ESIS' obligations under this PART are to:

a.      Investigate, adjust, and otherwise administer Claims, including the arrangement of a defense for litigated Claims, as ESIS deems necessary in accordance with ESIS' best professional judgment as a claims adjuster and state laws and regulations permit for monopolistic states. [Clean Harbors] agrees that ESIS may meet its obligations by engaging, at its reasonable discretion and on [Clean Harbors'] behalf, the services of persons or firms outside of ESIS' organizations.

b.      Review the facts of each Claim and the law applicable thereto to determine what compensation, if any, should be paid on [Clean Harbors'] behalf for each Claim.   ESIS shall obtain [Clean Harbors'] prior approval before offering to settle any Claim for an amount, which exceeds the amount of ESIS' Discretionary Settlement Authority Limit, and ESIS shall incur no liability in excess of the Discretionary Settlement authority Limit as a result of its failure to settle any Claim for an amount within the Discretionary Settlement Authority Limit.

c.      Determine what Allocated Loss Expenses shall be incurred in the investigation, adjustment, administration, and defense of each Claim.

                                        *        *        *

g.      Provide statistical or loss experience reports to [Clean Harbors] concerning the status of (a) Claims, (b) Claim reserves, and (c) Claim payment as agreed upon by ESIS and [Clean Harbors] in writing from time to time.

                                        *        *        *

i.      Administer all Claims reported to their conclusion and further investigate, adjust, and otherwise administer any late Reported Claims according to the terms and conditions of this PART.

(*See* Exhibit A, at Section II, Part A, Paragraph 3(a)-(i).)

16.     The ESIS Agreement also gave ESIS broad authority and control relating to the

management of claims brought against Clean Harbors which were covered by the PEIC Policy:

> **5.     CLAIMS ADJUSTING SERVICES – GENERAL PROVISIONS:**
>
> a.     ***ESIS shall have full authority and control in all matters pertaining to the investigation, adjustment, and administration of Claims*** covered by this PART, subject to any limitations which ESIS and [Clean Harbors] may have agreed upon as set forth in this agreement or in any Addendum to this PART agreed to and duly executed by both parties hereto.

(*See* Exhibit A, at Section II, Part A, Paragraph 5.) (Emphasis added.)

**C.     The Underlying *Lopez* Action**

17.     In 2001, Eddie Lopez was employed as a semi roll-off driver by Waste

Management, Inc.  The semi roll-off trucks that Mr. Lopez drove picked up dumpsters of various

sizes.

18.     One of Mr. Lopez's assigned stops was Clean Harbors' Chicago Facility.  One of

Mr. Lopez's tasks at the Chicago Facility was to pick up dumpsters containing crushed 55-gallon

drums that had been processed through a fuels blending operation in Building 43 of the facility.

In the fuels blending operation, drums of chemicals that ranged from 95% liquid to almost 100%

solid were tilted, drained and emptied by a large mechanical auger.

19.     In accordance with the Resource Conservation and Recovery Act ("RCRA")

regulations, the drums processed through the Building 43 fuel blending operation were to be

empty.

20.     The drums were to be visually inspected before being crushed and dropped

through a conveyor into a roll-off dumpster that would generally hold 80-100 empty crushed

drums. When full, the dumpster was covered with a tarp and moved to a pick-up area several hundred feet from Building 43.

21.     According to evidence developed in the underlying action, when Mr. Lopez picked up dumpsters containing crushed drums, he would drive his Waste Management truck to the dumpster area, attach a J-hook to the dumpster, and a mechanical device would lift the dumpster onto his truck. The operation would take approximately 5 to 10 minutes.

22.     After picking up dumpsters at the Chicago Facility on or about April 6, 2001, Mr. Lopez visited the emergency room at St. Mary's Hospital in Kankakee, Illinois complaining of dizziness and nausea. Mr. Lopez was discharged that same day with instructions to follow up with a physician. Thereafter, Mr. Lopez returned to work.

23.     On April 29, 2001, Mr. Lopez again visited the emergency room, complaining of vomiting, dizziness, blurred vision, and acute pain in the front of his head. Mr. Lopez was diagnosed with a migraine headache and released. Two days later, Mr. Lopez again visited his own doctor, who suspected that he had contracted meningitis or encephalitis and admitted him to St. Mary's Hospital, where he performed blood lumbar puncture tests. These tests did not reveal the cause of Mr. Lopez's symptoms.

24.     After being hospitalized at St. Mary's Hospital for several days, he was transferred to Northwestern Memorial Hospital in Chicago, Illinois. The presumptive diagnosis from the physicians at Northwestern Hospital was encephalitis. While at Northwestern, Mr. Lopez lapsed into a coma and thereafter became paralyzed from the waist down.

25.     Lopez recovered from his coma and was released from Northwestern on June 7, 2001. He is currently confined to a wheelchair and suffers from brain damage. According to the

evidence in the underlying action, Lopez had little recollection about his illness, hospitalization, or the events leading up to his illness.

**D.     Mr. Lopez Files a Lawsuit and ESIS Retains MMK**

26.     On or about September 25, 2002, Mr. Lopez filed a petition for discovery in the Circuit Court of Cook County, Illinois against several respondents, including Clean Harbors, seeking information on the kinds of chemical residues that may have been present at the Chicago facility at the time Mr. Lopez became ill.

27.     Clean Harbors provided notice of the petition to PEIC through ESIS. On or about November 11, 2002, ESIS retained MMK and Krauskopf to respond to the petition for discovery. Upon information and belief, Krauskopf was retained by ESIS without regard to whether he was qualified or maintained the skills and experience necessary to properly and competently represent Clean Harbors' interests.

28.     On or about March 27, 2003, Mr. Lopez filed an original action against Clean Harbors in the Circuit Court of Cook County (hereinafter, the "original action"), alleging that he suffered bodily injury as a consequence of exposure to unknown substances at the Chicago Facility, and claiming that his alleged exposure occurred on April 6, 2001.  Clean Harbors removed that original action to the United States District Court for the Northern District of Illinois. On July 2, 2003, the original action was voluntarily dismissed.

29.     On or about June 30, 2004, Mr. Lopez and Mrs. Lopez filed a second action in the Circuit Court of Cook County, Illinois based on the alleged April 6, 2001 occurrence at the Chicago Facility. The second action was also removed to the United States District Court for the Northern District of Illinois on or about June 22, 2005, and is referred to hereinafter as the Lopez Action.

30.     In the Lopez Action, Mr. Lopez alleged, among other things, that he suffered bodily injury as a result of inhaling toxic fumes from crushed barrels at the fuel blending operation at the Clean Harbors Chicago facility on April 6, 2001.

31.     Krauskopf and Sax entered their appearances on behalf of Clean Harbors in the Lopez Action. At all relevant times until April 1, 2008, Clean Harbors continued to be represented in the Lopez Action by Krauskopf, Sax and MMK, who were at all times being instructed and directed by ESIS.

32.     The central issue in the underlying Lopez Action was the cause of Mr. Lopez's alleged injury. Mr. Lopez's theory was that he was exposed to toxic chemicals while loading the crushed drums at the Chicago Facility on or about April 6, 2001. In support of that theory, Mr. Lopez retained Ernest Chiodo, a lawyer and doctor, to establish a causal connection between Clean Harbors' operations at the Chicago Facility and Mr. Lopez's alleged injury.

33.     Dr. Chiodo opined that, among other things, Mr. Lopez's injuries to his central nervous system were caused by long-term exposure to toxic substances and an acute exposure to a "witches brew" of chemicals at the Chicago Facility sometime in April, 2001, resulting in Type 3 Solvent Related Chronic Encephalopathy ("SRCE"). Dr. Chiodo was unable, however, to identify a specific chemical or chemicals to which Mr. Lopez was exposed, a specific date of exposure, a specific dosage of chemical, a specific concentration of chemical, or a specific duration of exposure that caused Mr. Lopez's injuries.

34.     ESIS and MMK retained Dr. James Hillman, a purported board certified toxicologist, as Clean Harbors' expert witness to defend against Dr. Chiodo's theory of the cause of Mr. Lopez's alleged injuries. Dr. Hillman opined that there was overwhelming evidence in the medical records that the disease process Mr. Lopez suffered was an acute infection affecting

his central nervous system. Dr. Hillman further opined that there was no basis in the medical literature of an acquired central nervous system infectious disease being casually related to an exposure of a toxicant.

35. Dr. Hillman was deposed on December 10, 2007 and again on December 21, 2007. During his depositions, Dr. Hillman admitted that, contrary to his own representations, he was not board certified in medical toxicology. Board certification for medical toxicology is governed by the American Board of Emergency Medicine, which is the delegated body with certification authority, and a member board of the American Board of Medical Subspecialties. The American Board of Medical Subspecialties is the pre-eminent entity that oversees the certification of physician specialists in the United States. Dr. Hillman also admitted that he was not certified by the American Board of Emergency Medicine in the subspecialty of medical toxicology. He further admitted that he failed the certification examination in the subspecialty of medical toxicology five times between 1994 and 2004.

36. Dr. Hillman never personally examined Mr. Lopez. Dr. Hillman also testified that he arrived at his conclusions without reviewing the deposition testimony of Mr. Lopez's two treating physicians because MMK did not provide him with the deposition transcripts.

37. In addition, MMK did not provide Dr. Hillman with a list of the chemicals that were processed at the Chicago Facility – a list that MMK had produced to the plaintiffs in discovery. Accordingly, Mr. Lopez's counsel was able to establish during Dr. Hillman's deposition that he did not even know what chemicals Mr. Lopez was alleged to have been exposed to at the Chicago Facility, let alone how they may have affected Mr. Lopez.

38. Prior to his deposition, neither MMK nor ESIS reported to Clean Harbors that there existed any issues regarding Dr. Hillman's credentials.

39.     After the expert depositions were completed, MMK moved to bar Dr. Chiodo's opinion under *Daubert*, arguing that there was no evidence that Mr. Lopez was exposed to toxic chemicals at the Chicago Facility. On these same grounds, Clean Harbors moved for summary judgment. On February 29, 2008, Judge James F. Holderman, Chief Judge of the United States District Court for the Northern District of Illinois, found that Dr. Chiodo's opinions were based upon accepted medical principles and were adequately supported by peer-reviewed medical literature.

40.     On March 3, 2008, MMK reported Judge Holderman's ruling to Clean Harbors, and, for the first time, further reported that fundamental problems existed with Dr. Hillman's testimony, including the fact that he was not board certified in medical toxicology by the American Board of Emergency Medicine and that he failed the certification examination in the subspecialty of toxicology five times.

41.     Shortly thereafter, Clean Harbors retained counsel of its own, Shefsky & Froelich Ltd., to provide an independent analysis and advice to Clean Harbors regarding the Lopez matter. Thereafter, on April 6, 2008, roughly three weeks before the scheduled trial date, attorneys at Shefsky & Froelich were granted leave to enter their appearances for Clean Harbors.

42.     Shefsky & Froelich conducted an immediate review of all materials made available to them and discovered even more problems with ESIS' and MMK's handling of the Lopez Action.

43.     Among other things, Shefsky & Froelich discovered that:

(a)     MMK failed to ensure that the proper corporate entity that owned and operated the Chicago Facility was named as the party defendant in the Lopez Action;

(b)     MMK had incorrectly answered interrogatories concerning the types of chemicals processed at the Chicago Facility;

11

(c)    Mr. Lopez had served requests to admit facts after the close of discovery. Rather than moving to strike the requests or to seek a protective order, MMK, without notice to or consultation with Clean Harbors, responded to the requests to admit. In the process, MMK made inaccurate and damaging admissions;

(d)    MMK had neglected to depose Mr. Lopez's economic expert, Dr. Smith, and neither MMK nor ESIS designated an economic expert on Clean Harbors' behalf;

(e)    MMK incorrectly answered interrogatories concerning the nature and availability of insurance;

(f)    MMK had failed to raise appropriate affirmative defenses;

(g)    MMK did not investigate or conduct discovery from potentially important third-party witnesses;

(h)    MMK did not conduct discovery on Mr. Lopez's workers' compensation claim arising out of his illness, thereby waiving relevant defenses;

(i)    Neither MMK nor ESIS sought an independent medical examination of Mr. Lopez;

(j)    MMK did not investigate or file claims against any potentially culpable third parties;

(k)    MMK failed to prepare for and properly conduct the depositions of Mr. Lopez's expert witnesses, including Dr. Chiodo; and

(l)    MMK did not cooperate fully in turning over file materials to Shefsky & Froelich in order to protect Clean Harbors' interests.

44.    As a consequence of ESIS' and MMK's failures to properly investigate, manage and defend the underlying litigation, Clean Harbors concluded that it could not risk taking the Lopez case to trial. As a result, Clean Harbors was forced to enter into an unfavorable settlement with Mr. Lopez. Had Clean Harbors been properly represented by ESIS and MMK in the defense of the Lopez Action, Clean Harbors would have been able to fully and successfully defend the Lopez Action.

45. As a direct and proximate cause of ESIS' and MMK's conduct identified above, Clean Harbors was forced to settle with Mr. Lopez on grossly unfavorable terms, and was required to expend attorneys' fees and costs retaining Shefsky & Froelich, and others, to obtain a proper evaluation and to otherwise protect Clean Harbors' interests. Clean Harbors incurred these additional attorneys' fees and costs as a direct result of ESIS' and MMK's negligence in failing to properly prepare the defense of the Lopez Action.

## FIRST CLAIM FOR RELIEF
### (Professional Negligence – ESIS, Inc.)

46. Clean Harbors incorporates by reference the allegations contained in paragraphs 1 through 45 above as though fully set forth as paragraph 45.

47. ESIS undertook a duty and responsibility to act with the reasonable care and skill of an ordinary professional claims administer in the provision of claims adjusting and risk management services on behalf of Clean Harbors, including the claims asserted against Clean Harbors in the Lopez Action.

48. ESIS breached its duty to Clean Harbors through one or more of the following acts and omissions, among others, which will become evident through discovery:

(a) Failing to properly and adequately investigate the Lopez claims before the Lopez Action was filed;

(b) Failing to retain competent attorneys on Clean Harbors' behalf to defend the Lopez Action;

(c) Failing to promptly and accurately report to Clean Harbors problems ESIS panel counsel encountered in defending the Lopez Action;

(d) Failing to supervise the activities of ESIS' panel counsel in the Lopez Action;

(e) Failing to ensure that Clean Harbors' interests were protected by retaining competent experts;

(f)     Failing to exercise professional care and skill in managing Clean Harbors' claims against other culpable parties in the Lopez Action; and

(g)     Otherwise being negligent and careless in protecting Clean Harbors' interests in defending the Lopez Action which will become apparent through discovery.

49.     As a direct consequence of ESIS's negligence, Clean Harbors sustained damages including the costs of settling the Lopez Action, as well as fees and costs paid to ESIS for its deficient claims adjusting services, additional attorneys' fees and costs paid to Shefsky & Froelich, and others, for its efforts to correct and sufficiently defend the shortcomings in the Lopez Action and to adequately protect Clean Harbors' interests in that litigation.

50.     As a direct and proximate cause of the acts and omissions of ESIS as identified herein, Clean Harbors suffered damages in an amount to be proven at trial.

**WHEREFORE,** Clean Harbors Environmental Services, Inc., requests this Court enter judgment in its favor and against Defendant ESIS, Inc., and that Clean Harbors receive its actual damages, costs, interest, attorneys' fees, and such other and further relief as this Court deems proper and just.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – ESIS, Inc.)

51.     Clean Harbors incorporates by reference the allegations contained in paragraphs 1 through 45 above as though fully set forth as paragraph 51.

52.     ESIS contracted with Clean Harbors to, among other things, properly investigate, evaluate, handle and manage the claims asserted against Clean Harbors under the PEIC Policy, arrange defenses for claims, including hiring and supervising counsel, employing experts, and properly settling claims.

14

53. In addition, under the ESIS Agreement, ESIS had an obligation to provide Clean Harbors with statistical or loss experience reports concerning the status of each claim.

54. The Lopez Action constituted a "claim" under the ESIS Agreement.

55. Beginning in 2001 and continuing through 2008, ESIS breached its obligations under the ESIS Agreement by:

      (a) Failing to properly investigate, adjust or administer the Lopez Action;

      (b) Failing to retain competent attorneys to defend Clean Harbors in the Lopez Action;

      (c) Failing to provide timely and accurate reports to Clean Harbors concerning the Lopez Action;

      (d) Failing to supervise the actions of its panel counsel to defend Clean Harbors in the Lopez Action; and

      (e) Failing to arrange for proper experts in the Lopez Action.

56. As a direct consequence of ESIS's breach of the ESIS Agreement, Clean Harbors sustained damages, including the costs of settling the Lopez Action, as well as fees and costs paid to ESIS for its deficient claims adjusting services, additional attorneys' fees and costs paid to Shefsky & Froelich for its efforts to investigate and attend to the shortcomings of MMK in the Lopez Action and to adequately protect Clean Harbors' interests in the litigation.

57. Clean Harbors has satisfied all of its obligations under the ESIS Agreement.

58. As a direct and proximate result of ESIS' unilateral dealings and material breach of the terms of the ESIS Agreement, as well as ESIS' breach of the implied covenant of good faith and fair dealing, Clean Harbors has suffered damages in an amount to be proven at trial.

**WHEREFORE,** Clean Harbors Environmental Services, Inc., requests this Court enter judgment in its favor and against Defendant ESIS, Inc., and that Clean Harbors receive its actual

15

damages, costs, interest, attorneys' fees, and such other and further relief as this Court deems proper and just.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – ESIS, Inc.)

59.     Clean Harbors incorporates by reference the allegations contained in paragraphs 1 through 45 above as though fully set forth as paragraph 59.

60.     Holding itself out to Clean Harbors and the public as a professional service provider, and as a licensed public claims adjuster under 63 PA. CONS. STAT. ANN. §1602, ESIS owed Clean Harbors a fiduciary duty, including undivided, unselfish, and unqualified loyalty, honesty and trust.

61.     ESIS breached its fiduciary duty to Clean Harbors through the following acts and omissions, among others:

> (a)     Failing to properly and adequately investigate the Lopez claims before the Lopez Action was filed;
>
> (b)     Failing to retain competent attorneys on Clean Harbors' behalf to defend the Lopez Action;
>
> (c)     Failing to promptly and accurately report to Clean Harbors problems its panel counsel encountered in defending the Lopez Action;
>
> (d)     Failing to supervise the activities of the attorneys it retained to defend Clean Harbors in the Lopez Action;
>
> (e)     Failing to ensure that Clean Harbors' interests were protected by hiring competent experts; and
>
> (f)     Failing to exercise professional care and skill in managing the claims asserted against Clean Harbors.

62.     ESIS' conduct in either failing to comprehend or expressly overlooking MMK's lack of qualifications to defend Clean Harbors in the Lopez Action and its failure to properly manage the litigation, was a consequence of ESIS placing its own financial interests above those

of Clean Harbors and was therefore intentional, willful, deliberate, and was undertaken with full knowledge of its effect on Clean Harbors.

63.     ESIS' breach of its fiduciary duties has proximately caused significant damage to Clean Harbors in amounts to be proven at trial.

**WHEREFORE,** Clean Harbors Environmental Services, Inc., requests this Court enter judgment in its favor and against Defendant ESIS, Inc., and that Clean Harbors receive its actual damages, costs, interest, attorneys' fees, exemplary damages for ESIS, Inc.'s intentional, deliberate and willful disregard for Clean Harbors, its officers, directors and employees, and such other and further relief as this Court deems proper and just.

### FOURTH CLAIM FOR RELIEF
### (Professional Negligence - Sax, Krauskopf and Myers Miller)

64.     Clean Harbors incorporates by reference the allegations contained in paragraphs 1 through 45 above as though fully set forth as paragraph 64.

65.     In November, 2001, Krauskopf, Sax and Myers Miller were retained to represent Clean Harbors' interests and to provide legal advice in connection with the petition for discovery filed by Mr. Lopez. Each of them were also later retained by ESIS to represent Clean Harbors' interests and to provide legal advice and services in connection with all phases of the underlying Lopez Action.

66.     At all times, Clean Harbors had an attorney-client relationship with Krauskopf, Sax, and Myers Miller.

67.     Krauskopf, Sax, and Myers Miller owed Clean Harbors a duty to exercise a degree of professional skill and care in the provision of legal services on Clean Harbors' behalf.

68.     Krauskopf, Sax, and Myers Miller breached their duty to Clean Harbors through one or more of the following acts and omissions, among others:

17

(a) Filing responses to Mr. Lopez's requests for admission of facts without Clean Harbors' knowledge or consent that contained false and damaging admissions;

(b) Failing to object or make a motion to strike Mr. Lopez's requests for admission of facts, even though they were served after the close of discovery;

(c) Failing to investigate or file claims against potentially liable third parties;

(d) Failing to initiate or take discovery on the affirmative defense of contributory negligence;

(e) Failing to properly investigate, prepare for, and depose expert witnesses in the Lopez Action;

(f) Failing to arrange for an independent medical evaluation of Mr. Lopez;

(g) Failing to depose third party witnesses with potentially exculpatory information;

(h) Failing to move to dismiss Mr. Lopez's amended complaint;

(i) Failing to adequately investigate Clean Harbors' operations, processes, and documents relating to contested issues of fact;

(j) Failing to preserve legal and factual defenses;

(k) Failing to investigate responses to interrogatories concerning the applicability of insurance coverage;

(l) Failing to cooperate fully with the transfer of Clean Harbors' file materials to replacement counsel; and

(m) Otherwise being negligent and careless in protecting Clean Harbors' interests in defending the Lopez Action

69. As a consequence of Krauskopf's, Sax's, and Myers Miller's negligence, Clean Harbors was forced to settle the Lopez Action on unfavorable terms, rather than proceeding to trial on the merits of the case.

70. As a direct consequence of Krauskopf's, Sax's, and Myers Miller's, negligence, Clean Harbors also sustained damages by incurring additional attorneys' fees and costs paid to

Shefsky & Froelich and others for its efforts to investigate, correct and defend the Lopez Action and to adequately protect Clean Harbors' interests in that litigation.

71.     But for Krauskopf's, Sax's, and Myers Miller's negligence, Clean Harbors would have been successful in defending the claims asserted against it in the Lopez Action.

72.     As a direct and proximate cause of the acts and omissions of Krauskopf, Sax, and Myers Miller as identified herein, Clean Harbors suffered damages in an amount to be proven at trial.

**WHEREFORE** Clean Harbors Environmental Services, Inc., requests this Court enter judgment in its favor and against Defendants, Howard Krauskopf, Jason Sax, and Myers Miller & Krauskopf, LLC, jointly and severally, and that Clean Harbors receive its actual damages, costs, interest, attorneys' fees, and such other and further relief as this Court deems proper and just.

**Plaintiff demands a trial by jury.**

Dated:  June 23, 2009                    CLEAN HARBORS ENVIRONMENTAL SERVICES, INC.


                                        By:_____ /s/ Steven D. Pearson_____
                                                    One of its Attorneys


Steven D. Pearson (No. 6190506)
Mitchell J. Edlund (No. 6229190)
Dawn J. Blume (No. 6271961)
MECKLER BULGER TILSON MARICK & PEARSON LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois  60606
(312) 474-7900 - Telephone
(312) 474-7898 – Facsimile

M:\13469\pleading\com001me.doc