UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CLEAN HARBORS ENVIRONMENTAL SERVICES, INC.**, a Massachusetts corporation, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 09 C 3789<br>)<br>) District Judge Robert W. Gettleman |
| **ESIS, INC.**, a Pennsylvania corporation;<br>**MYERS MILLER KRAUSKOPF, LLC**, an Illinois limited liability company;<br>**HOWARD KRAUSKOPF**, individually;<br>and **JASON M. SAX**, individually, | )<br>) Magistrate Judge Susan E. Cox<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

Susan E. Cox, Magistrate Judge

In this motion for a protective order, plaintiff Clean Harbors Environmental Services, Inc. ("Clean Harbors") seeks to shift certain costs of electronic discovery to defendants ESIS, Inc. ("ESIS"), Myers Miller & Krauskopf, LLC, Howard Krauskopf, and Jason Sax (collectively referred to as "MMK") because it has had to pay a third party vendor to cull, filter, and process the electronically stored information requested by defendants in discovery. Clean Harbors claims that from the beginning it informed defendants of the need to share costs, provided them with the cost comparison of the discovery vendors it considered hiring, and generally believed it to be in negotiations with defendants as to how costs could be split. MMK did not file a response to Clean Harbors' motion. ESIS, however, is disputing Clean Harbors' position. ESIS argues that Clean Harbors did not raise any burden or cost concerns as to the discovery, did not attempt to or ask the

Court to limit production, and at no point refused to produce discovery because of the alleged burden. Now the electronic discovery is complete. ESIS believes Clean Harbors' request, at this point, comes too late. As outlined below, plaintiff's motion for Protective Order Relating to its Production of Electronic Data [dkt. 72] is granted in part.

**I.     Background Facts**

To better address this dispute it is helpful to understand the parties' respective roles in this lawsuit. Clean Harbors provides environmental and hazardous waste management services. ESIS, in this circumstance, is a third-party claims administrator that provides claims adjusting services and risk management services. In 2000, Clean Harbors entered into an agreement with ESIS to have it manage and adjust insurance claims asserted against Clean Harbors. So when, in 2002, a lawsuit was filed against Clean Harbors by an employee of Waste Management, Inc., Eddie Lopez, ESIS was involved.

Mr. Lopez, who had been assigned a stop at a Clean Harbors' facility, was to pick up dumpsters containing 55-gallon drums that had been processed at the facility. On several different occasions in April 2001, after completing his job duties, Mr. Lopez visited the emergency room. At these visits he complained of headaches, dizziness, vomiting and blurred vision. Ultimately, at one of these emergency visits Mr. Lopez was hospitalized, lapsed into a coma, and thereafter became paralyzed from the waist down. Following his hospitalization, Mr. Lopez filed the lawsuit against Clean Harbors, alleging that he was exposed to toxic chemicals while at the Clean Harbors facility.

At issue in this case are Clean Harbors' allegations that in Mr. Lopez's underlying case, ESIS retained "instructed and directed"[1] legal counsel from MMK to defend Clean Harbors, but did

---

[1]Plaintiff's Compl. ¶31, dkt. 1.

so "without regard to whether [they were] qualified or maintained the skills and experience necessary to properly and competently represent Clean Harbors' interests."[2] Specifically, Clean Harbors claims that weeks before trial it was forced to hire independent counsel who soon discovered that MMK had improperly handled the case on several levels.[3] Clean Harbors then determined that it was unable, at that point, to successfully defend the case, which forced it into an unfavorable settlement. The present lawsuit against ESIS and MMK, therefore, alleges professional negligence, breach of contract, and breach of fiduciary duty.

**II.   Analysis**

Returning to the discovery dispute before us, Clean Harbors' motion claims that the information sought by ESIS was largely inaccessible. Clean Harbors explains that it did not receive a litigation hold until 2008 but ESIS requested emails dating back to April 2001, when Mr. Lopez was injured, through January 2010 when the settlement was finalized. Clean Harbors, however, did not have a document archive system. Most of that information was kept on backup tapes in the ordinary course of business. To get to the requested discovery, then, Clean Harbors has had to physically pull backup tapes from an offsite storage facility, load them onto their system, extract certain data, and then provide that data to counsel. Because there was no way to search the data themselves, Clean Harbors' counsel retained a third-party vendor to filter, cull, and process the 166 GB of data, which has now cost nearly $91,000.

In Clean Harbors' motion, it argues that if we follow the test most recently used in this Circuit to determine cost shifting, the majority of the factors weigh in favor of cost shifting. In an effort to address all arguments raised by the parties, we will review the dispute through that prism.

---

[2]Plaintiff's Compl. ¶27, dkt. 1.
[3]Plaintiff's Compl. ¶42, dkt. 1.

Also important in this particular case, however, is the fact that the parties had ongoing discussions, throughout this discovery process, as to how costs *could* be shared. We find this to be an additional consideration, and perhaps more pertinent here.

### A. Standards For Electronic Discovery

The general rule in discovery is that the responding party bears the costs of complying with discovery requests.[4] But a responding party may ask the court to protect it from "'undue burden or expense'" by either restricting the discovery sought or by shifting the costs to the non-producing party.[5] Cost shifting has been found to potentially be appropriate only when "inaccessible data is sought," such as with backup tapes.[6] With respect to electronic discovery, "three main tests have been suggested to determine when it is appropriate to shift the costs of searching and producing inaccessible data to the requesting party" to protect it from unduly burdensome discovery.[7] Out of those tests, Judge Ashman in our circuit has summarized the necessary factors as follows:

> 1) the likelihood of discovering critical information; 2) the availability of such information from other sources; 3) the amount in controversy as compared to the total cost of production; 4) the parties' resources as compared to the total cost of production; 5) the relative ability of each party to control costs and its incentive to do so; 6) the importance of the issues at stake in the litigation; 7) the importance of the requested discovery in resolving the issues at stake in the litigation; and 8) the relative benefits to the parties of obtaining the information.[8]

### B. Accessibility of the Data

Before we address the factors, we first must note ESIS's claim that the information sought was not "inaccessible," and therefore does not warrant the use of the cost shifting factors. On this point we disagree. Clean Harbors explains that because it did not have a document archive system,

---

[4] *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).
[5] *Wiginton v. CB Richard Ellis, Inc.,* 229 F.R.D. 568, 572 (N.D. Ill. 2004); *see* Fed. R. Civ. P. 26(c).
[6] *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280, 284 (S.D.N.Y. 2003).
[7] *Wiginton,* 229 F.R.D. at 572.
[8] *Id.*

the relevant electronic information was kept on backup tapes in the ordinary course of business for purposes of disaster recovery. To get to the information, Clean Harbors had to physically pull the backup tapes for each month from an offsite storage facility, then load them onto a system, and extract certain information, repeating this for each month. Clean Harbors explains that at the end of the process it had copies of six users' mailboxes for each month requested. But Clean Harbors could not, itself, search, filter, or access this data. It required the third party vendor to complete the process. Courts have already agreed that when information is stored on backup tapes, it is "likened to paper records locked inside a sophisticated safe to which no one has the key or combination."[9] ESIS has given us no reason to believe that the information on the backup tapes in this case would be more easily accessible.

Clean Harbors also responds to ESIS's claim that it should have kept the relevant documents in another form, rather than on backup tapes. Again, Clean Harbors explains that it did not know until 2008 that there was a problem with the underlying Lopez litigation, when it retained new counsel, so there was no reason for it to preserve the electronic information in any other form than how it was maintained in the ordinary course of business. With this background in mind, we can properly proceed to our analysis of the cost shifting factors.

### C. Application of the Cost Shifting Factors

Regarding the first two factors - the likelihood of discovering critical information and the availability of such information from other sources - Clean Harbors claims these weigh in favor of ESIS bearing the cost because ESIS should have already possessed the critical documents. Clean Harbor's claim is that ESIS should have had access to any exchanged information in the underlying

---

[9]*Zubulake,* 216 F.R.D. at 291.

litigation because it was supervising MMK. ESIS asserts, however, that it was not involved in, or privy to, any of the critical communications because the emails discovered were all between the law firm representing Clean Harbors, defendant MMK, and Clean Harbors itself. ESIS claims it has only now seen those communications, through discovery. For example, ESIS specifically points to discovered communications regarding the retention of Clean Harbors' toxicologist expert, James Hillman, M.D. ESIS asserts that because no ESIS employee was copied to those emails, they show that it was not ESIS who retained him but, rather, Clean Harbors and MMK. ESIS also makes this same argument - that it was not directly involved in the underlying litigation - with respect to certain interrogatory responses Clean Harbors claims ESIS should have known about. ESIS argues that it did not see or review those discovery responses during litigation (nor did it apparently have reason to), so it did not have access to these documents until this litigation ensued.

There is no question that the communications discovered through this process are critical to the case, and go directly to the allegations alleged by Clean Harbors. Because this motion comes to us after discovery is complete, however, this is not the time to analyze whether the requests were as narrowly tailored as they should have been. As to whether another party already had these documents in a more easily accessible format, both sides have taken opposite views on that point. ESIS refers to several emails that were exchanged between Clean Harbors and MMK only. That certainly shows that ESIS was not involved in those communications at the time, but avoids the question of whether ESIS - as the party who hired MMK - could have *retrieved* these emails directly through MMK. Unfortunately, with the limited information we have before us, we cannot answer that question. Though, as Clean Harbors argues, that would seem to be a logical assumption.

The next three factors relate solely to costs. First, we find the relationship between the

amount in controversy as compared to the discovery costs at least partially weighs in favor of Clean Harbors. According to Clean Harbors, the total recovery sought is the full confidential settlement amount, but Clean Harbors expended somewhere around $91,000 simply to produce this discovery. Without disclosing the full settlement amount (because the parties wish to keep that number confidential) we find that $91,000 is enough of a financial burden on Clean Harbors to find it "substantial," warranting at least some cost shifting.[10] But we also note that the cost of this restoration is not "'significantly disproportionate' to the projected value of this case."[11]

The next two factors relate to the parties' resources and the ability for each party to control costs. Clean Harbors agrees that all parties involved have substantial resources, which distinguishes this case from some others where there is an obvious party with a financial disadvantage.[12] ESIS argues, however, that the focus should be on Clean Harbors' resources as compared to the total cost of production. When that is analyzed, ESIS claims that $90,000 in electronic discovery is not significant. Despite the parties' arguments over how "slight" this factor weighs for or against each party, we find it generally unhelpful here. This factor, as pointed out by Clean Harbors, is better suited to a dispute where there is a large discrepancy in each side's financial positions, which we do not have here.

Clean Harbors next claims that ESIS and MMK had the ability to control costs but, instead, demanded "a wide-sweeping" search. In other words, Clean Harbors claims both defendants failed to limit the search to only essential employees and, therefore, failed to even attempt to keep costs down. Clean Harbors also notes that MMK and ESIS, at some point, even expanded the search

---

[10] *See Oppenheimer Fund, Inc.*, 437 U.S. at 361(noting that the test is whether the cost is "substantial").
[11] *Zubulake,* 216 F.R.D. at 288.
[12] *See Wiginton,* 229 F.R.D. at 576.

(though we should note that one brief claims it was ESIS that expanded the search and another brief claims it was MMK that expanded the search).[13]

ESIS responds that at no point did Clean Harbors ask it to limit the number of employees whose data would be searched. ESIS then refers to an email communication where Clean Harbors dictated the search terms and parameters, asserting that it was Clean Harbors, not ESIS, who controlled the search.[14] This can be somewhat misleading, however. The email referenced appears to be one where Clean Harbors is simply attempting to set parameters, and is looking for feedback from defendants as to what those should be. Clean Harbors asserts that it was at this point that one of the defendants remained silent.[15] From the Court's review of the attached emails, it appears that both ESIS and MMK eventually responded, and both requested certain search parameters.[16] If that is true, then we find that Clean Harbors should not receive a negative inference in the cost shifting analysis because it was, along the way, working with defendants to create the search. And as noted above, because this motion comes to us after discovery is complete, this is not the time to analyze whether the search could have been more appropriately - or narrowly - tailored. ESIS is correct that if Clean Harbors had concerns regarding the scope of the search, the time to address those would have been during the discovery process. Now we are left with each side claiming the other could have proceeded differently, but we have no specific information to determine whether that is indeed the case.

Though both sides should have an incentive to control costs, the heavy burden has up until now always been on Clean Harbors because it controlled the search. And a large part of any cost

---

[13] Pl's Memo in Support at 3; Pl's Reply at 12.
[14] Pl's Memo. in Support, Exh. C.
[15] *Id.*
[16] *See* Pl's Memo in Support, Exhs. C, F.

analysis "pivots around the selection of the vendor,"[17] which Clean Harbors picked in this case. But Clean Harbors first shared this information with defendants in attempts, it appears, to jointly select a service. Both defendants, however, apparently left it to Clean Harbors to decide. That, coupled with defendants' agreement with Clean Harbors as to the proposed search terms - with their own additions thereto - can hardly be reason to turn this cost shifting factor against Clean Harbors.

The only remaining cost shifting factor worth noting here is the importance of the requested discovery in resolving the issues at stake in the litigation. (We do not need to address the importance of the issues in the litigation or the benefits to the parties in obtaining the information, as both sides agree that these factors are neutral). Clean Harbors argues that this factor weighs in favor of cost shifting because MMK and ESIS likely already possessed the majority of the critical documents. ESIS, however, claims this is not true, arguing that it produced less than 5,000 pages of relevant documents related to the underlying case, whereas Clean Harbors produced more than 100,000 pages. ESIS then goes back to its earlier argument that it was not advised or consulted on the routine progress in the underlying Lopez case, so it did not have the critical documents. Again, ESIS notes as an example that it was left out of the communications regarding the retention of Clean Harbors' expert, but MMK and Clean Harbors possessed all of those communications.

This factor is designed to focus on the relevance of the discovery, and whether it is "reasonably calculated to lead to the discovery of admissible evidence."[18] The parties have not argued that the discovery sought in this process is irrelevant. To the contrary, both sides agree that the discovery directly assists them in resolving the issues in the case. Instead, the parties go back to who had the most access to the discovery. We have already stated that there is no way for the

---

[17] *Wiginton,* 229 F.R.D. at 576.
[18] Fed.R.Civ.P. 26(b)(1); *see Wiginton,* 229 F.R.D. at 576-77.

Court to conclude, at this point, who had easier access to what documents. And because we do not believe this factor warrants a discussion on that point, we deem this factor neutral because both parties needed this information and agree it is relevant.

### D. The Parties' Discussions on Cost-Shifting

Perhaps in this case, more important than using the traditional cost-shifting factors, is an analysis of the parties' negotiations regarding whether they would share costs. In January 2010, Clean Harbors began communicating with defendants about the search terms and the need for a vendor to filter, search, and cull the relevant discovery.[19] The emails that follow, through January 2011, include several requests from Clean Harbors to both ESIS and MMK to share costs.[20] For example, in emails in August and September 2010, counsel for Clean Harbors requested from MMK search terms and whether MMK would be willing to share costs relating to the discovery search.[21] The topic of cost sharing was again noted in emails in November and December 2010 with both defendants.[22] It was at this point that Clean Harbors proposed splitting costs by thirds: one-third ESIS, one-third MMK, and one-third Clean Harbors. On December 7, 2010, counsel for ESIS noted in an email that he would follow-up "about the cost share."[23] It was not until January 2011 that both ESIS and MMK provided Clean Harbors with an answer: ESIS stated that it was "not inclined at this time to agree to 1/3 split between the parties" but suggested getting together to further discuss the issue; and MMK offered to pay Clean Harbors $7,500 as its contribution.[24]

Despite its initial willingness to discuss the topic with Clean Harbors, ESIS now argues that

---

[19] Pl's Memo in Support, Exh. C.
[20] Pl's Memo in Support, Exhs. C, E, F, G, H.
[21] Pl's Memo in Support, Exh. C.
[22] Pl's Memo in Support, Exh. E.
[23] *Id.*
[24] Pl's Memo in Support, Exhs. G, H.

it should not be required to share in any of the costs incurred by Clean Harbors. Here, ESIS argues that the lawsuit was initiated by Clean Harbors, not ESIS, it has already had the unfair financial burden of spending a considerable amount in legal fees, and the action is meritless so the burden should remain on Clean Harbors. ESIS then claims that because Clean Harbors waited until now to bring this to the Court's attention, its request is ultimately too late.

This is where we disagree. It appears that all counsel began this discovery process as they should have, by working together and communicating about the process. Though we take the point made by ESIS - that Clean Harbors did not come into court to ask for limitations on discovery but, instead, has only asked at the conclusion for cost splitting - we do not find this necessarily detrimental. It seems reasonable that none of the parties expressed a concern to the Court earlier because, what is more likely is that the discovery sought is necessary and helpful to all parties involved.

Now ESIS is essentially asking the Court to punish Clean Harbors for relying on defendants' indications that they might consider cost sharing. Defendants had consistently indicated, even in January 2011, at least the possibility of working out a deal with Clean Harbors. And because avoiding court intervention is always preferred, we do not find it unreasonable that Clean Harbors waited to file a motion until ESIS concluded, more than a year into the discovery, that it was not willing to cost share. Courts are always encouraging parties to cooperate and work together to come to agreements before coming into court.[25] That is precisely what Clean Harbors was attempting to

---

[25] *See, e.g., Grundstad v. Ritt,* No. 96 C 1857, 1998 WL 178811, *2 (N.D. Ill., April 13, 1998)(stating that the parties should "cooperate" and work out an arrangement to share costs of discovery); *see also DeGeer v. Gillis,* No. 09 C 6974, 2010 WL 5096563, *21 (N.D. Ill. December 8, 2010)(noting that counsel should have collaborated on e-discovery and that "going forward" the parties were "to genuinely confer in good faith and make reasonable efforts to work together" on discovery).

do here.

Nonetheless, we also acknowledge that there was no meeting of the minds as to whether the costs of discovery would be shared before Clean Harbors proceeded with the entire production. Taking this into consideration, and the fact that Clean Harbors is the plaintiff (so it is equally benefited by this discovery to prove its case) we find it appropriate to split costs as follows: Clean Harbors is to cover 50% of the costs of restoration and searching the data from the backup tapes and ESIS and MMK are to cover, each equally, the remaining 50% of the costs.[26]

### III. Conclusion

Plaintiff's motion for Protective Order Relating to its Production of Electronic Data is granted in part [dkt. 72]. As outlined above, the parties are to share in the costs of discovery according to the following allocation: Clean Harbors is to cover 50% of the costs of restoration and searching the data from the backup tapes and ESIS and MMK are to cover, each equally, the remaining 50%.

**IT IS SO ORDERED**.

**ENTERED: May 17, 2011**

                                      **UNITED STATES MAGISTRATE JUDGE**
                                      Susan E. Cox

---

[26]*Zubulake,* 216 F.R.D. at 289-90 (noting that: (1) the precise allocation of cost shifting "is a matter of judgment and fairness" rather than a mathematical calculation relating to the cost shifting factors; and (2) only the costs of restoration and searching should be shifted, not costs for reviewing and producing electronic data).